IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2012 at Knoxville

**STATE OF TENNESSEE v. GREGORY MATHIS and ELZA EVANS**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1806     Steve R. Dozier, Judge**

---

**No. M2011-01096-CCA-R3-CD - Filed September 5, 2013**

---

Following a jury trial, the Defendants, Gregory Mathis and Elza Evans, were each convicted of aggravated burglary, aggravated robbery, and two counts of especially aggravated kidnapping. See Tenn. Code Ann. §§ 39-13-305, -13-402, -14-403. The trial court sentenced Defendant Mathis to an effective sentence of 126 years and Defendant Evans to an effective sentence of two lifetimes without the possibility of parole. In this appeal as of right, the Defendants raise the following issues: (1) Defendant Evans contends that the trial court erred in denying his motion to sever his trial from Defendant Mathis's trial; (2) both Defendants contend that the especially aggravated kidnapping offenses were essentially incidental to the aggravated robbery offense; (3) both Defendants contend that the evidence was insufficient to sustain their convictions; and (4) both Defendants contend that the trial court erred in imposing their sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Gregory Mathis.

Jason Chaffin, Nashville, Tennessee, for the appellant, Elza Evans.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela Sue Anderson and Rachel Marie Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

Terry Becker testified at trial that in 2009 he was renting a small two-bedroom house with his fiance, Lisa Lewis, in Nashville. On the night of February 25, 2009, co-defendant Emily Turner,[1] a friend of Ms. Lewis, and co-defendant Danny Lee Sams,[2] Turner's boyfriend, came to his house. Mr. Becker testified that Turner and Sams had visited the house in the past and that Turner would occasionally spend the night in his guest bedroom. Mr. Becker also testified that he had previously loaned Turner and Sams money and that he had helped Sams secure various odd jobs. According to Mr. Becker, Turner and Sams got into an "argument" while they were at his house. Mr. Becker testified that Sams told him that Turner was "driving [him] crazy or something to that effect." Sams then "stormed out and took [Turner's] car," stranding her at Mr. Becker's house.

Mr. Becker testified that co-defendant Turner rejected several offers he made to help her retrieve the car. Instead, Turner stayed in his guest bedroom and was up late "visiting" with Ms. Lewis. Mr. Becker testified that he went to bed "late in the evening" and that Ms. Lewis eventually joined him later that night. The next morning, Mr. Becker awoke at approximately 7:45 a.m. Mr. Becker testified that he saw Turner standing in the doorway of the guest bedroom. Mr. Becker asked Turner if she had let the dogs out, and she replied that she was about to. Mr. Becker then went to his kitchen to make some coffee. As Mr. Becker was making his coffee he saw two African-American men standing in his living room. Both men were dressed in "dark colored" clothes, had bandanas over their faces, wore sunglasses, and had plastic gloves on their hands. Both men were also wearing baseball caps and had the hoods from their sweatshirts up. Both men had guns and pointed them at Mr. Becker.

Mr. Becker testified that one of the men told him to get "all of the way down" on the ground. Mr. Becker complied, and the men duct taped his hands behind his back. The men then moved Mr. Becker to a dining room chair where they "strapped [him] to the chair around [his] chest and [his] upper arms" with duct tape. The men also taped Mr. Becker's arms to the chair. After Mr. Becker was taped to the chair, one of the men brought co-defendant Turner into the room and had her lie down on the floor. Mr. Becker testified that one of the men then went into the bedroom, woke Ms. Lewis up, brought her into the dining room, and had her lie down next to Turner. According to Mr. Becker, one of the men said, "Lisa we've been looking for you for a long time." The man said that Ms. Lewis "owed them $18,000." The man also nudged Turner with his foot several times and repeatedly said, "We don't know who this b---h is," to the point that Mr. Becker thought that they were overemphasizing it.

---

[1]Co-defendant Turner was tried with the Defendants, but she did not join in this appeal.

[2]Co-defendant Sams was indicted with the Defendants, but his case was severed prior to trial when he pled guilty.

The men made Ms. Lewis kneel down in front of Mr. Becker, and one of them asked Ms. Lewis if she loved Mr. Becker. When Ms. Lewis stated that she did, the man said that Mr. Becker would write two checks for $9,000, one made out to Ms. Lewis and one made out to co-defendant Turner, and that the women would cash the checks and return with the money in thirty minutes or they would kill Mr. Becker. While the man was explaining the plan he had a gun pointed at Ms. Lewis, and the other man pointed his gun at Mr. Becker. One of the men got Mr. Becker's checkbooks and brought it back to the dining room. The men freed one of Mr. Becker's hands, and Mr. Becker wrote the checks as instructed. Sometime after the women left, the branch manager from a nearby Regions Bank called Mr. Becker. Mr. Becker testified one of the men put a gun to his head and leaned in so he could overhear the conversation. The branch manager told Mr. Becker that he was calling to verify that he had written the checks, and Mr. Becker told the branch manager to cash the checks.

A short time after the phone call from the bank manager, one of the men left the room to answer a cell phone call. When the man came back into the room he said that the police were at the bank, that they needed to leave, and told the other man to "take care" of Mr. Becker. The other man gagged Mr. Becker and bound him with more duct tape. The men broke Mr. Becker's cell phone, took the battery out of his home phone, and then fled the house. After they left, Mr. Becker was able to free himself. Mr. Becker testified that the skin on his arms was torn and bleeding from the duct tape. Mr. Becker also testified that at least one of the men stayed with him at all times during the ordeal and that the men kept their guns out the entire time they were there. Mr. Becker recalled that one of the men did most of the talking and that the other man stayed with him the majority of the time. Mr. Becker later inspected the house and found no evidence of forced entry.

Ms. Lewis testified at trial that on the night of February 25, 2009, co-defendants Turner and Sams came over to the house she shared with Mr. Becker. Ms. Lewis recalled that Turner and Sams got into an argument that night and Sams left in Turner's car. Ms. Lewis testified that she thought Sams's taking the car "was very unusual" because she had "never known [Sams] to leave [Turner] without her car because it was her car, not theirs." Ms. Lewis also testified that Turner showed no interest in finding Sams or getting her car back that night. Instead, Turner and Ms. Lewis stayed up late taking drugs and "talking all night." Ms. Lewis admitted to taking Percocet while Turner used cocaine. At some point during the night, Turner told Ms. Lewis to go to bed with Mr. Becker because it would "look more suspicious" if she stayed in the guest bedroom. Ms. Lewis testified that she got into bed with Mr. Becker around 4:00 a.m.

Ms. Lewis testified that when she woke up the next morning there was a man with a bandana and a "hoodie on" standing over her and pointing a gun at her. The man motioned for her to get up and took her into the dining room where Ms. Lewis saw Mr. Becker, co-

defendant Turner, and another masked man holding a gun. Ms. Lewis testified that one of the men told her to get down on the ground and then repeatedly said that they had "been looking everywhere for [her]." The man said that Ms. Lewis owed them money and that they were "going to get it." Ms. Lewis testified that the man then had her get up and go kneel down in front of Mr. Becker. The man put a gun to her head and asked her if she loved Mr. Becker. When she said yes, the man said that if she loved Mr. Becker she would do what they told her to. The men then had Ms. Lewis lie back down on the ground while Mr. Becker wrote two checks.

Ms. Lewis testified that one of the men said that she and co-defendant Turner would go to the bank and cash the checks for them. Ms. Lewis recalled that the man referred to Turner as "whoever this b---h is" and emphasized that he did not know Turner. Ms. Lewis also recalled that neither one of the men ever said her last name and that they checked her driver's license to make sure Mr. Becker had written the check to the right person. One of the men took her to the bedroom, so she could put on a sweatshirt. Ms. Lewis testified that the man kept a gun pointed at her the entire time. While they were in the bedroom, Ms. Lewis asked if she could get some cigarettes out of the night stand. When she opened the drawer, the man saw $300 in cash and a debit card. The man took the money and the debit card and demanded that Ms. Lewis give him the PIN for the account, which Ms. Lewis did. The men told her to come back in thirty minutes with the money or they would kill Mr. Becker.

Ms. Lewis testified that co-defendant Turner drove to the bank. According to Ms. Lewis, Turner repeatedly said that she wanted to stop somewhere and call co-defendant Sams. At some point while they were driving to the bank, Turner told Ms. Lewis, "[T]hey know you're wanted, they don't think you'll call the police." Ms. Lewis testified that when they arrived at the bank she "came unglued" and explained to a bank employee what was happening. The employee had Ms. Lewis call the police on his cell phone while the bank manager called Mr. Becker to "buy him a little bit of time." Ms. Lewis recalled that Turner continued to talk about how she needed to call Sams. The bank employees who helped Ms. Lewis testified at trial that she was "hysterical" while Turner was "real calm" and "distant." While they were at the bank, Turner pulled out her cell phone and made a phone call. Turner told the person she called that she was not at Mr. Becker's house, that she was at the bank, and whoever was going to pick her up should not go to Mr. Becker's house.

Ms. Lewis admitted that when she called the police and initially spoke with the responding officers she used a fake name. Ms. Lewis explained that, at the time, she had a drug problem and an outstanding warrant for a probation violation. Ms. Lewis testified that she was afraid of being arrested by the police. Ms. Lewis was arrested later that day after the police had completed their investigation into the robbery. Ms. Lewis testified that she gave

the check made out to her to the police when they arrived. However, the police could not locate the check made out to co-defendant Turner. The bank employee who assisted Ms. Lewis testified that he had seen two checks both made out for $9,000 when the women arrived at the bank. Turner told the police that she had given the check to Ms. Lewis, but Ms. Lewis testified that she did not remember Turner ever giving her the check. The detective who responded to the bank testified that Turner told him her check "must've gotten blown away in the wind."

Based upon Ms. Lewis's 911 call, officers from the Metropolitan Nashville Police Department surrounded Mr. Becker's house. Officers observed two men dressed in "all black, dark clothing" exit the house and begin hurriedly walking away from the house. When an officer approached the men they began running in opposite directions. Officers subdued both men. Defendants Mathis and Evans were identified at trial as the two men caught fleeing from Mr. Becker's house. Officers saw the Defendants "dropping stuff" as they ran and collected trails of evidence from each of the Defendants leading back toward Mr. Becker's house.

On the ground where Defendant Evans had been running, police found a wig, a black baseball cap, a cigarette lighter, a cell phone, and a .380 caliber pistol. Defendant Evans had "long black" wig hairs on his neck and head. A search of Defendant Evans revealed a roll of duct tape, a black bandanna, and a cell phone. On the ground where Defendant Mathis had been running, police found a cell phone, a black baseball cap, a wig, a pair of sunglasses, three plastic gloves, and Mr. Becker's debit card. An officer saw Defendant Mathis throw a gun over a fence into a neighbor's yard and a .9mm pistol was later recovered from the neighbor's yard. Both of the recovered guns were fully loaded and ready to fire. When Defendant Mathis was stopped, he had on plastic gloves with pieces of duct tape stuck to them and a hairnet for a wig on his head. A search of Defendant Mathis revealed a bandanna, the key to a Jeep Cherokee, and $341 in cash.

A Jeep Cherokee was found a block away from Mr. Becker's house. Fingerprints belonging to Defendant Mathis and co-defendant Turner were found on the outside of the vehicle. Inside the vehicle was a receipt for the purchase of two pairs of sunglasses, two bandanas, and a "hoodie," timestamped at 3:09 a.m. on February 26, 2009. Inside Mr. Becker's house, a piece of duct tape with part of a plastic glove attached to it was recovered from a chair in the dining room. No fingerprints were recovered from inside Mr. Becker's house. Mr. Becker testified that after the police searched his house, Turner was brought there and eventually picked up by co-defendant Sams. Later that day, Mr. Becker discovered two checks were missing from his checkbook. Mr. Becker received a phone call from a nearby bank informing him that a woman was attempting to cash one of the checks made out for $3,500. Turner and Sams were arrested at the bank with Mr. Becker's missing checks.

Co-defendant Sams testified that he had pled guilty in this case and was awaiting sentencing. Sams testified that at the time of the robbery he was dating co-defendant Turner. According to Sams, Turner came up with the idea to rob Mr. Becker, and he helped her plan the robbery. Sams testified that Turner introduced him to Defendant Mathis and that they approached him about helping them with the robbery because they knew he had a gun. Defendant Mathis agreed to help them, but he said "that he wanted to do it his way; that he had a friend from his hometown that he could trust." They agreed that they would force Mr. Becker to write two checks totaling $18,000 and that they would split the money three ways: Sams and Turner would get $6,000; Defendant Mathis would get $6,000; and Defendant Mathis's "partner" would get $6,000.

Co-defendant Sams testified that the plan was for co-defendant Turner to stay the night at Mr. Becker's house and leave the backdoor unlocked. Sams also testified that he drove by Mr. Becker's house with Defendant Mathis so he could get an idea of how he would enter the house. According to Sams, on the night of February 25, 2009, he pretended to have an argument with Turner so she could stay the night at Mr. Becker's house. Sams testified that Turner later called him and told him that Mr. Becker and Ms. Lewis had believed them. The next day Turner called him from the bank to tell him that the police were on their way and not to go to Mr. Becker's house. Sams testified that he called Defendant Mathis and told him to get out of the house because the police were on their way. Sams claimed that he did not know Defendant Evans and that Defendant Evans was not involved in the planning of the robbery.

Based upon the foregoing evidence, the jury convicted the Defendants of all of the charged offenses. The trial court held a sentencing hearing and issued detailed, written sentencing orders with respect to each of the Defendants. The Defendants have failed to include a transcript of the sentencing hearing in the appellate record. However, the trial court's sentencing orders and the evidence presented at the sentencing hearing have been included in the record before us.

With respect to Defendant Mathis, the trial court noted that he had three prior convictions for aggravated robbery and a prior conviction for theft of property valued at $1,000 or more but less than $10,000. The trial court found that no mitigating factors applied in this case and that the following enhancing factors applied: (2) Defendant Mathis was a leader in the commission of the offenses; (9) Defendant Mathis possessed a firearm during the commission of the aggravated burglary; and (10) Defendant Mathis had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114.

The trial court sentenced Defendant Mathis as a Range III, persistent offender to thirteen years for the aggravated burglary conviction, fifty years for both of the especially aggravated kidnapping convictions, and twenty-six years for the aggravated robbery conviction. The trial court also found that Defendant Mathis was an offender whose record of criminal activity was extensive and a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court concluded that Defendant Mathis was a dangerous offender and that consecutive sentences were warranted to protect the public from further serious criminal conduct by Defendant Mathis and were reasonably related to the severity of the offenses. As such, the trial court ordered Defendant Mathis's sentences for the especially aggravated kidnapping and aggravated robbery convictions to be served consecutively, for an effective 126-year sentence.

With respect to Defendant Evans, the trial court noted that he had prior convictions for second degree murder, facilitation of attempted first degree murder, especially aggravated robbery, aggravated robbery, and burglary. The trial court found that no mitigating factors applied in this case and that the following enhancing factors applied: (9) Defendant Evans possessed a firearm during the commission of the aggravated burglary; (10) Defendant Evans had no hesitation about committing a crime when the risk to human life was high; (11) the offenses involved the threat of death or serious bodily injury to another person, and Defendant Evans had previously been convicted of a felony that resulted in death or serious bodily injury; and (12) Defendant Evans was on parole at the time of the offenses. See Tenn. Code Ann. § 40-35-114.

The trial court sentenced Defendant Evans as a Range III, persistent offender to fourteen years for the aggravated burglary conviction and twenty-six years for the aggravated robbery conviction. With respect to the especially aggravated kidnapping convictions, the trial court found that Defendant Evans qualified as a repeat violent offender pursuant to Tennessee Code Annotated section 40-35-120 and sentenced him to life without the possibility of parole for each conviction. The trial court also found that Defendant Evans was an offender whose record of criminal activity was extensive and a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court concluded that Defendant Evans was a dangerous offender and that consecutive sentences were warranted to protect the public from further serious criminal conduct by Defendant Evans and were reasonably related to the severity of the offenses. As such, the trial court ordered Defendant Evans's sentences for the especially aggravated kidnapping convictions to run consecutively, for an effective sentence of two lifetimes without the possibility of parole.

## ANALYSIS

*I. Defendant Evans's Severance Motion*

Defendant Evans contends that the trial court erred by denying his motion to sever his trial from Defendant Mathis's trial. Defendant Evans argues that Defendant Mathis would have testified in his favor had they been tried separately but that he did not testify at their joint trial in order to protect his Fifth Amendment right against self-incrimination. The State responds that Defendant Evans has waived this issue by failing to include a transcript of the severance hearing in the appellate record and that we must presume the trial court's decision was correct.

Tennessee Rule of Criminal Procedure 8 provides for the joinder of defendants "if each of the defendants is charged with accountability for each offense included" in the indictment. Prior to trial and upon a motion of one of the defendants, the trial court must grant a severance of the defendant if it finds a severance is "appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). The decision to grant or deny a severance of defendants "is a matter that rests within the sound discretion of the trial court," and we will not reverse the trial court's ruling "absent clear abuse of that discretion." State v. Dotson, 254 S.W.3d 378, 390 (Tenn. 2008). To determine whether the trial court has abused its discretion, we examine the record to see "whether the Defendant was 'clearly prejudiced'" by the trial court's decision. Id.

After the trial court's deadline for pre-trial motions had passed, Defendant Evans filed a motion to sever his trial from Defendant Mathis's trial. In the motion, Defendant Evans claimed that Defendant Mathis had "written letters to [him] indicating his willingness to set the record straight" and had spoken to his attorney about testifying on Defendant Evans's behalf. However, Defendant Evans did not attach any of these alleged letters to his severance motion. Defendant Evans has failed to include the transcript of the severance hearing in the appellate record, but there is a minute entry in the technical record stating only that the trial court denied the motion. In addition to this, the trial court stated in its sentencing order for Defendant Mathis that Defendant Mathis declared during his allocution that "he brought [Defendant] Evans into the crime without Evans knowing exactly what would happen." Defendant Evans has made no attempt to supplement the record with the transcript even though the State raised the issue of waiver in its brief.

The defendant, as the appellant, is required to furnish this court with a fair, accurate, and complete record of what transpired in the trial court with respect to the issues raised on appeal. Tenn. R. App. P. 24(b); State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). In the absence of such a record, we presume that the trial court's ruling was supported by sufficient evidence. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Furthermore, we have previously held that it "is not an abuse of the trial court's discretion

to refuse to sever when the defendant claims that a co[-]defendant would have given exculpatory testimony at a separate trial but the co[-]defendant invoked the [F]ifth [A]mendment at a joint trial." State v. Ash, 729 S.W.2d 275, 279 (Tenn. Crim. App. 1986); see also State v. Price, 46 S.W.3d 785, 805 (Tenn. Crim. App. 2000); State v. Jeffrey W. Osborne, No. 01C01-9807-CC-00292, 1999 WL 961384, at *3 (Tenn. Crim. App. Oct. 22, 1999). Additionally, co-defendant Sams testified on Defendant Evans's behalf at trial that Defendant Evans was not involved in the planning of the robbery. Accordingly, we conclude that this issue is without merit.

## II. Especially Aggravated Kidnapping Convictions

Both Defendants contend that the especially aggravated kidnapping offenses were essentially incidental to the aggravated robbery offense. Both Defendants argue that their confinement of Mr. Becker and removal of Ms. Lewis were essentially incidental to their taking of Mr. Becker's money and checks and that the trial court should have merged the especially aggravated kidnapping convictions into the aggravated robbery conviction. The State responds that the aggravated robbery was completed when the Defendants took Mr. Becker's money, debit card, and checks and that the continued confinement of Mr. Becker and removal of Ms. Lewis went beyond what was necessary for the completion of the aggravated robbery. The State further responds that the trial court's failure to instruct the jury on the definition of "substantial interference" was harmless error.

Our supreme court recently altered the method in which courts in this state address the issue of whether the movement or confinement used to justify a kidnapping conviction is essentially incidental to an accompanying felony or sufficient enough, standing alone, to support a kidnapping conviction. State v. White, 362 S.W.3d 559 (Tenn. 2012). In doing so, our supreme court noted that the kidnapping statutes currently in effect "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." Id. at 577. The court also concluded that the jury is in a better position than an appellate court to address the due process concerns that arise when a defendant is convicted of a kidnapping offense accompanied by a separate felony. Id. at 577-78.

To facilitate the jury's review, trial courts are now required to give the following instruction defining the "substantial interference" element of a kidnapping offense:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that

necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

• the nature and duration of the victim's removal or confinement by the defendant;

• whether the removal or confinement occurred during the commission of the separate offense;

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

White, 362 S.W.3d at 580-81 (footnote omitted).

The Defendants have failed to include the trial court's jury instruction in the appellate record. Given that the Defendants were tried over a year before our supreme court's decision in White, we will presume that the trial court did not give the "substantial interference" jury instruction. However, failure to give the White instruction may constitute harmless error. State v. Terrance Antonio Cecil, --- S.W.3d ---, No. M2011-01210-SC-R11-CD, 2013 WL 4046608, at *10 (Tenn. Aug. 12, 2013); White, 362 S.W.3d at 580 n.20; State v. Robert Fusco, --- S.W.3d ---, No. M2012-01068-CCA-RM-CD, 2012 WL 6062856, at *19 (Tenn. Crim. App. Dec. 6, 2012), perm. app. denied, (Tenn. Apr. 11, 2013). Here, the Defendants confinement of Mr. Becker went beyond what was necessary for the commission of the aggravated robbery.

We agree with the State's assertion that the aggravated robbery was completed when the Defendants took possession of Mr. Becker's money, debit card, and checks. As will be

discussed more fully below, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-401, -402. Theft of property is the knowing exercise of control over another's property without the owner's effective consent and with the intent to deprive the owner of the property. Tenn. Code Ann. § 39-14-103(a). Property is defined as "anything of value" including "interests in or claims to wealth" and "credit." Tenn. Code Ann. § 39-11-106(a)(28).

The Defendants' argument is based upon the mistaken assumption that the checks taken from Mr. Becker had no value until they had been converted into cash at a bank. However, this court has long held that "in the absence of any proof to show a lesser value, then the amount written on the face of the check represents its true value." State v. Evans, 669 S.W.2d 708, 712 (Tenn. Crim. App. 1984); see State v. Cheryl Bass, No. M2006-02563-CCA-R3-CD, 2008 WL 544586, at *7-8 (Tenn. Crim. App. Feb. 28, 2008), perm. app. denied, (Tenn. Oct. 6, 2008) (applying this rule to a stolen check that was made out to a third party); see also State v. Tyrone Ralph Wright, No. M2010-02096-CCA-R3-CD, 2012 WL 601332, at *14 (Tenn. Crim. App. Nov. Feb. 23, 2012), perm. app. denied, (Tenn. June 25, 2012) (we presume that blank checks, "as a means for an account holder to access funds, [have] a monetary value over zero").

The checks taken by the Defendants at Mr. Becker's house were each valued on their face at $9,000, for a total value of $18,000. The Defendants' sending Ms. Lewis and co-defendant Turner to a nearby bank to convert the checks into cash constituted an attempt to commit the separate and uncharged criminal offense of forgery. See Tenn. Code Ann. § 39-14-114. After the Defendants had taken Mr. Becker's money, debit card, and two checks valued together at $18,000, they continued to hold him at gun point and keep him duct taped to a chair, essentially holding him hostage while Ms. Lewis and Turner attempted to pass the forged checks. Furthermore, the Defendants' confinement of Mr. Becker and threats to kill him were designed to reduce their risk of detection. To that end, the Defendants broke Mr. Becker's cell phone and attempted to disable his home phone.

With respect to Ms. Lewis, we note that the indictments in this case charged the Defendants with the aggravated burglary and aggravated robbery of only Mr. Becker. There is no evidence in the record that the Defendants took anything from Ms. Lewis. This court has previously held "that when the robbery victim and the kidnapping victim are two different persons, the issue is better characterized as a question of whether sufficient evidence exists to sustain a conviction for [especially] aggravated kidnapping" rather than whether the kidnapping of one victim was merely incidental to the robbery of another. State v. Richard Lacardo Elliott, No. M2001-01990-CCA-R3-CD, 2002 WL 31528538, at *4 (Tenn. Crim. App. Nov. 15, 2002), perm. app. denied, (Tenn. Feb. 24, 2003). Because Ms.

-11-

Lewis was not a victim of the aggravated robbery, we conclude that the especially aggravated kidnapping conviction with respect to her was a separate and distinct offense from the aggravated robbery. As such, we conclude beyond a reasonable doubt that the jury's verdict would have been the same with respect to both of the especially aggravated kidnapping convictions absent the trial court's failure to give the White instruction.

### III. Sufficiency of the Evidence

Both Defendants contend that the evidence was insufficient to sustain their convictions. Defendant Mathis challenges the sufficiency of the evidence with respect to only his conviction for the especially aggravated kidnapping of Ms. Lewis arguing that Ms. Lewis could not have been confined because she was sent to the bank to cash the forged checks. Defendant Evans argues that "there was no reliable evidence presented at trial to definitively identify [him] as having been sufficiently involved in the machinations of the crimes . . . to sustain verdicts of guilty on all counts." Defendant Evans explains that there was no evidence that he was involved in the planning of the offenses and was not "in charge" at the time the offenses took place. The State responds that the evidence was sufficient to sustain the Defendants convictions on all counts.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Aggravated burglary is defined as entering into a habitation without the effective consent of the owner with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401, -402, -403. Aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-401, -402. Theft of property occurs when a person, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Especially aggravated kidnapping is defined as the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" and accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-302, -305.

Based upon the evidence presented at trial, we conclude that the evidence was sufficient to sustain the Defendants convictions for all of the charged offenses. The Defendants both entered Mr. Becker's home without his consent, each with a loaded gun and wearing a dark hooded sweatshirt, a wig, sunglasses, a bandana, and plastic gloves. This evidence was sufficient for the jury to conclude that the Defendants entered Mr. Becker's home with the intent to commit a felony, theft, or assault. The Defendants took Mr. Becker's checks, money, and debit card using their guns and while threatening to kill Mr. Becker and Ms. Lewis. As previously discussed, after the aggravated robbery was completed, the Defendants continued to confine Mr. Becker using their guns to threaten Mr. Becker's life.

With respect to Ms. Lewis, the Defendants argue that she could not have been kidnapped because they released her to go to the bank to cash one of the stolen checks. However, especially aggravated kidnapping encompasses not only unlawful confinement but also unlawful removal. After the Defendants had taken possession of Mr. Becker's money, debit card, and checks, Ms. Lewis was forced to leave the house and go to the bank because she was told by the Defendants that Mr. Becker would be killed if she did not return in thirty minutes with the proceeds from the forged check. Additionally, the Defendants did not send Ms. Lewis to the bank alone. Instead, they sent her with co-defendant Turner who, unbeknownst to Ms. Lewis, was involved in the robbery plot and instrumental in its planning.

Defendant Evans argues that the evidence was insufficient to sustain his convictions because he was not involved in the planning of the offenses and because he did not physically take Mr. Becker's checks, money, and debit card. Defendant Evans argues that he was unaware "that a robbery was going to take place until it was too late." However, the fact that Defendant Evans entered Mr. Becker's house armed and disguised was more than sufficient circumstantial evidence for the jury to conclude that Defendant Evans was a full participant in the offenses.

The fact that Defendant Evans did not participate in the planning of the offenses does not make the evidence insufficient to sustain his convictions. A person is criminally responsible for an offense committed by another when "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Defendant Evans's actions aided Defendant Mathis in the completion of all of the offenses, and co-defendant Sams testified that Defendant Mathis's "partner" was to receive $6,000 as his share of the proceeds from the robbery.

*IV. Sentencing Issues*

Both Defendants contend that the trial court erred in imposing their sentences. Defendant Mathis argues that the trial court placed "undue and excessive wight" on the enhancement factors it applied to him and that his sentence was "greater than that deserved" for the offenses he committed. Defendant Mathis also argues that the trial court erred by imposing consecutive sentences. Defendant Evans argues the trial court applied an improper enhancement factor, placed undue weight on the remaining enhancement factors, and erred by concluding that no mitigating factors applied.[3] The State responds that the Defendants have waived these issues by failing to include a transcript of the sentencing hearing in the

---

[3]Defendant Evans does not challenge in this appeal the trial court's imposition of sentences of life without the possibility of parole with respect to his convictions for especially aggravated kidnapping.

-14-

appellate record. However, the record contains the trial court's detailed sentencing orders for each defendant and the evidence introduce at the sentencing hearing. Therefore, we will address the Defendants' issues on the merits.

### A. Length of Defendant Mathis's Sentences

Our supreme court recently clarified that appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations:"

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. §40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. §40-35-103(5).

Defendant Mathis does not allege that the trial court misapplied any of the enhancement factors or that it erred in finding no mitigating factors applied to this case. Instead, Defendant Mathis alleges that the trial court placed undue weight on the enhancement factors. However, even prior to the abuse of discretion standard of review announced in Bise, this court did not review the weight trial courts assigned to enhancement and mitigating factors. See Carter, 254 S.W.3d at 344-45. With respect to Defendant Mathis's claim that the length of his sentences were greater than that deserved for the offenses committed, we note that Defendant Mathis admits in his brief that the trial court did not sentence him to the maximum length for any of his convictions and that "[a]ll of [the] sentences [were] roughly in the middle of the range for each of the offenses." Accordingly, we conclude that the length of each of Defendant Mathis's sentences was reasonable and that the trial court did not abuse its discretion.

*B. Consecutive Nature of Defendant Mathis's Sentences*

The standard of review on the issue of consecutive sentencing is unclear under our state's current jurisprudence. As previously stated, our supreme court recently clarified that appellate courts review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." Bise, 380 S.W.3d at 709. Our supreme court has also recently announced that this standard "applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

However, our supreme court has not issued a definitive ruling on the standard of review to be applied regarding consecutive sentencing. In response, some panels of this court are applying an abuse of discretion standard, while others are continuing to apply a de novo standard of review until instructed otherwise by our supreme court. See generally State v. Eric Demond McCathern, No. M2011-01612-CCA-R3-CD, 2012 WL 5949096, at *4-5 (Tenn. Crim. App. Nov. 16, 2012) (majority applying abuse of discretion standard of review and concurring opinion advocating de novo standard of review), perm. app. denied, (Tenn. Feb. 25, 2013).

A trial court may order sentences to run consecutively if the trial court finds by a preponderance of the evidence that the "defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). Consecutive sentences may also

be applied if the trial court finds the "defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). In addition to the dangerous offender determination, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed" before it can impose consecutive sentences on the basis that the defendant is a dangerous offender. State v. Wilkerson, 905 S.W.3d 933, 938 (Tenn. 1995).

Defendant Mathis contends that the trial court incorrectly found that he had an extensive record of criminal activity. By its terms, the consecutive sentencing statute requires that only one of the statutory factors to be applicable in order for the trial court to impose consecutive sentencing. Tenn. Code Ann. § 40-35-115(b). Here, the trial court found that Defendant Mathis's actions in this case demonstrated little or no regard for human life and that he had no hesitation about committing crimes in which the risk to human life was high. The trial court also found that consecutive sentences were necessary to protect the public against further criminal conduct by Defendant Mathis because, in addition to the four offenses Defendant Mathis was convicted of here, he had five prior felony convictions including three aggravated robbery convictions. The trial court further found that consecutive sentences were reasonably related to the severity of the offenses because Defendant Mathis had entered the victims' home with a loaded weapon and made "repeated death threats against the victims if they did not comply." Based upon the foregoing and applying either standard of review, de novo or abuse of discretion, we affirm the trial court's imposition of consecutive sentences.

*C. Length of Defendant Evans's Sentences*

We begin by noting that Defendant Evans only challenges the length of his sentences for the aggravated burglary and aggravated robbery convictions. The trial court found that Defendant Evans qualified as a repeat violent offender pursuant to Tennessee Code Annotated section 40-35-120 and sentenced him to life without the possibility of parole for each of the especially aggravated kidnapping convictions. The trial court ordered that those sentences be served consecutively while the sentences complained of on appeal were to be served concurrently for an effective sentence of two lifetimes without the possibility of parole. Having upheld Defendant Evans's convictions for especially aggravated kidnapping, any issues regarding the length of his sentences for the aggravated burglary and aggravated robbery convictions are essentially moot as they are to be served concurrently with two sentences of life without the possibility of parole.

Nonetheless, as previously stated, we review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." Bise, 380 S.W.3d at 709. Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Id. at 706. Defendant Evans argues that the trial court erred by misapplying the enhancement factor that he had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). However, even if this were true, there were multiple other enhancement factors that applied and the length of each of Defendant Evans's sentences was consistent with the purposes and principles of sentencing.

Defendant Evans also argues that the trial court failed to apply several mitigating factors in its sentencing analysis. Defendant Evans argues that there was evidence to establish that he acted under strong provocation, substantial grounds existed to excuse his conduct, that he acted under duress or the domination of Defendant Mathis, and that he only played a minor role in the offenses. However, as previously discussed, the evidence at trial was sufficient to establish that Defendant Evans was an active participant in the offenses and was expected to receive $6,000 for his participation in the offenses. As such, the trial court did not abuse its discretion in rejecting Defendant Evans's claims that he was forced to participate in the offenses by Defendant Mathis and concluding that no mitigating factors applied to this case. Accordingly, we affirm the trial court's sentencing decisions with respect to the length of the sentences for Defendant Evans's convictions of aggravated burglary and aggravated robbery.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-18-